United States Bankruptcy Court
Southern District of Texas
**ENTERED**
October 07, 2026
Nathan Ochsner, Clerk

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | **CASE NO: 26-90386** |
| **TM36, LLC, *et al.*,** | § | |
| **Debtors.** | § | **Jointly Administered** |
| | § | **CHAPTER 11** |

**MEMORANDUM OPINION ON INSURED ADVOCACY GROUP'S MOTION TO COMPEL ARBITRATION (ECF NO. 312)**

Insured Advocacy Group, LLC ("IAG") moves to compel arbitration of the Debtors'[1] objection to its proof of claim.[2] The Debtors object to arbitration on various grounds.[3] For the reasons explained below, IAG's motion to compel arbitration is denied.

## BACKGROUND

The Debtors are engaged in the business of emergency response and property restoration services.[4] StopLoss acts as a holding company for other Debtors and Specialists serves as the party which enters into contracts on behalf of StopLoss.[5]

In August 2023, Specialists and IAG entered into a contract titled the "First Party Claims Non-Recourse Sale and Assignment Agreement" (the "Factoring Agreement").[6] The contract is a type of factoring agreement wherein Specialists agreed to sell certain accounts receivable it expected to receive in the future to IAG at a discount in exchange for immediate cash. IAG's purchase of receivables was effectuated through

---

[1] The Debtors in these chapter 11 cases are: TM36, LLC, StopLoss Specialists, LLC ("Specialists"), StopLoss, LLC ("StopLoss"), StopLoss Response Services, LLC, and StopLoss Logistics, LLC (collectively, the "Debtors").
[2] ECF No. 312; *see also* ECF No. 311.
[3] ECF No. 331.
[4] ECF No. 10.
[5] ECF No. 10 ¶¶ 14−18.
[6] ECF No. 312-1.

individual purchase addenda which set forth the specific account purchased, the amount of the account, the purchase price, and other additional terms.[7] Section 7.1 of the Factoring Agreement provides that if Specialists breaches any warranty or representation and warranty, Specialists is obligated to repurchase any account receivable effected by such breach.[8]

Relevant here are the parties' agreements for Specialists to sell and IAG to purchase receivables related to three of StopLoss's restoration projects. These include work StopLoss was performing for: (i) the Suburban Extended Stay Facility (the "Suburban Project"); (ii) the Lee Ho Village Townhome Association (the "Lee Ho Project"); and (iii) Fortune Property Management LLC (the "Fortune Project," and collectively the "Projects").[9]

The table below reflects the relevant purchase addenda for each project and the date they were executed:[10]

| **Project:** | **Invoice No.** | **Date:** |
|---|---|---|
| Suburban | 3-A | April 29, 2024 |
| | 3-B | June 3, 2024 |
| | 3-C | July 3, 2024 |
| Lee Ho | SLS-5A | October 8, 2024 |
| | SLS-5B | October 30, 2024 |
| Fortune | SLS-6A | October 09, 2024 |
| | SLS 6-B | October 21, 2024 |
| | SLS 6-C | October 21, 2024 |
| | SLS 6-D | October 25, 2024 |
| | SLS-7A | November 19, 2024 |

[7] *See, e.g.,* ECF No. 312-2.
[8] ECF No. 312-1 § 7.1.
[9] *See Claim No. 30*, KROLL: STOPLOSS LLC CASE NO. 26-90386, https://cases.ra.kroll.com/StopLoss/Home-ClaimInfo (last visited Aug. 13, 2026).
[10] *Id.*

The original Factoring Agreement did not contain an arbitration clause.[11] However, on August 13, 2024, IAG and Specialists amended the Factoring Agreement through purchase addendum SLS-4A,[12] which was "part of and incorporated into the [Factoring] Agreement."[13] The August 13, 2024 addendum expressly amended the Factoring Agreement to add the following language to section 9.1.3:

> Notwithstanding the above, in lieu of litigation in a state or federal court located in New York, New York, Buyer, in its sole and absolute discretion, may elect to have any dispute, controversy or claim arising out of, relating to, in connection with or in respect of this Agreement resolved by arbitration under the Commercial Arbitration Rules of the American Arbitration Association.[14]

This arbitration provision appears in the purchase addenda for the Lee Ho and Fortune Projects.

On August 4, 2025, IAG filed a statement of claim with the American Arbitration Association ("AAA") asserting that StopLoss had breached the three above-mentioned contracts.[15] IAG also asserted that StopLoss's principals had fraudulently induced IAG to purchase the receivables associated with the Projects.[16] The arbitration proceedings were dismissed at some point prior to these Chapter 11 proceedings, and the parties dispute whether the dismissal was due to IAG not prosecuting its claims or StopLoss failing to pay their half of the required arbitration fees.[17]

---

[11] ECF No. 312-1.

[12] The addendum is seemingly unrelated to the dispute before the Court.

[13] ECF No. 312-2.

[14] ECF No. 312-2.

[15] ECF No. 376-5.

[16] ECF No. 376-5.

[17] *Compare* ECF No. 311 ¶ 12 ("The Arbitration did not proceed past the initial stages due to SLS' refusal to pay the required arbitration fees and was closed."), *with* ECF No. 331, at 9 ("IAG commenced an AAA arbitration prepetition and then allowed it to be dismissed for lack of prosecution.").

On January 20, 2026, certain petitioning creditors commenced an involuntary Chapter 11 case against StopLoss in the United States Bankruptcy Court for the Western District of Louisiana.[18] On March 5, 2026, the remaining debtors commenced their voluntary Chapter 11 proceedings in this district, which are being jointly administered under Case No. 25-90386.[19] And on March 12, 2026, the Honorable John W. Kolwe transferred the involuntary case to this District.[20]

The Court is concurrently adjudicating an adversary proceeding regarding a purchase addendum related to the Renaissance Tower Project in Case No. 26-3072.

On May 4, 2026, IAG filed a proof of claim in these Chapter 11 proceedings, asserting an unliquidated claim for an unknown amount.[21] From the evidence, it appears that IAG is asserting a close to $10 million claim for the repurchase of each Project's receivables plus attorney's fees.[22] They also assert a claim for fraudulent inducement for an unknown amount and similarly seek attorney's fees. Attached to IAG's proof of claim is IAG's statement of claim filed with the AAA, the Factoring Agreement, purchase addenda and other documents.[23] IAG's proof of claim was designated as "Claim No. 9" by the Court's CM/ECF system and is designated as "Claim No. 30" by the Debtors' claims agent. IAG seemingly filed an identical proof of claim on June 8, 2026, which was designated as "Claim No. 113" by the Debtors' claims agent.

On June 10, 2026, the Debtors filed an objection the IAG's proof of claim.[24] On July 10, 2026, IAG filed a motion to compel arbitration of

---

[18] Bankr. W.D. La. Case No. 26-50049, ECF No. 1.

[19] ECF No. 6.

[20] Bankr. W.D. La. Case No. 26-50049, ECF No. 12.

[21] *See Claim No. 30*, KROLL: STOPLOSS LLC CASE NO. 26-90386, https://cases.ra.kroll.com/StopLoss/Home-ClaimInfo (last visited July 31, 2026).

[22] *See* ECF No. 376-5 at 8–10 (demanding that StopLoss repurchase the Lee Ho Accounts from IAG at the repurchase price of $1,029,271.13; repurchase the Suburban Accounts from IAG at the repurchase price of $7,272,290.33; and repurchase the Fortune Accounts from IAG at the repurchase price of $1,463,717.71).

[23] *See* ECF No. 376-5.

[24] ECF No. 264.

the Debtors' objection to its proof of claim.[25] On July 31, 2026, the Debtors filed their response to IAG's motion to compel.[26] And on August 21, 2026, IAG filed its reply.[27] The Court heard argument on these matters on September 23, 2026, and thereafter took the matter under advisement.

## JURISDICTION & VENUE

28 U.S.C. § 1334(a) provides the District Court with jurisdiction over this proceeding. 28 U.S.C. § 157(b)(1) states that "[b]ankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11, referred under subsection (a) of this section, and may enter appropriate orders and judgments, subject to review under section 158 of this title." This proceeding has been referred to this Court under General Order 2012-6 (May 24, 2012). This is a core proceeding which the Court can consider under 28 U.S.C. §§ 157(b)(2)(A) and (B). The Court has constitutional authority to enter final orders and judgments. *Stern v. Marshall*, 564 U.S. 462, 486–87 (2011). Venue is proper under 28 U.S.C. §§ 1408 and 1409.

## DISCUSSION

IAG argues that the Debtors' claim objection is required to be arbitrated pursuant to the Factoring Agreement and the purchase addenda.[28] The Debtors object to arbitration on three grounds.[29] First, the Debtors contend that there is no enforceable arbitration provision in the documents.[30] Second, they argue that IAG has waived any right it had to compel arbitration by its activities in these proceedings.[31] Third, the Debtors contend that even if the arbitration provision is enforceable,

---

[25] ECF No. 312.
[26] ECF No. 331.
[27] ECF No. 362.
[28] ECF No. 312.
[29] ECF No. 331.
[30] ECF No. 331 ¶¶ 16−20.
[31] ECF No. 331 ¶¶ 21−25.

the Court should exercise its discretion and decline to compel arbitration under Fifth Circuit precedent.[32] Each argument will be addressed in turn.

## I. THE ARBITRATION PROVISION

The Debtors argue that IAG's claim related to the Suburban Project receivables is non-arbitrable because the multiple purchase addenda for that project do not contain any arbitration provisions.[33] They also contend that the claims arising out of the Lee Ho and Fortune Projects receivables are non-arbitrable because the arbitration provisions in those addenda are illusory.[34] The Debtors do not dispute that they entered into the Factoring Agreement or the purchase addenda. IAG contends that the August 13, 2024 purchase addenda amended the Factoring Agreement to require all disputes "arising out of, relating to, in connection with or in respect of" the Factoring Agreement to be resolved by arbitration.[35] In its view, this amendment provides IAG with the option to compel arbitration for all disputes related to the Factoring Agreement, including the disputes related to the Projects discussed above.

### A. Whether the Arbitration Provision Applies

Courts follow a two-step inquiry to determine whether to compel arbitration: (1) they consider whether "the party has agreed to arbitrate the dispute" and if so, (2) they ask "if any federal statute or policy renders the claims nonarbitrable." *MAPP, L.L.C. v. Floor & Decor Outlets of Am., Inc.*, No. 25-30536, 2026 WL 2265969, at *2 (5th Cir. Aug. 6, 2026) (quoting *Sherer v. Green Tree Servicing LLC*, 548 F.3d 379, 381 (5th Cir. 2008)) (citation modified). The first step contains two questions: (1) is there a valid agreement to arbitrate the claims and (2)

[32] ECF No. 331 ¶¶ 26–40.
[33] ECF No. 331 ¶¶ 17–18.
[34] ECF No. 331 ¶¶ 19–20.
[35] ECF No. 311 ¶ 9.

does the dispute in question fall within the scope of that arbitration agreement. *Id.*

State law governs whether there is a valid agreement to arbitrate. *Huckaba v. Ref-Chem, L.P.*, 892 F.3d 686, 688 (5th Cir. 2018). The Factoring Agreement contains a choice of law provision which designates Texas law as controlling[36] and the parties do not dispute that Texas law applies. The Debtors argue that they did not agree to arbitrate disputes related to the Suburban Project because there are no arbitration provisions in the purchase addenda related to that project.[37]

Although the Suburban Project addenda contain no arbitration provisions, looking at each individual purchase addenda in isolation ignores the realities of the parties' contractual relationship. The Factoring Agreement defined the parties' relationship and the general arrangement whereby IAG would purchase receivables from StopLoss. Each purchase addendum explicitly states that it "accompanies the [Factoring Agreement]" and "is part of and incorporated into the [Factoring] Agreement and the terms of the [Factoring] Agreement are incorporated into [each] Purchase Addendum."[38]

There has been no explicit argument that the Factoring Agreement and the purchase addenda were divisible contracts, as defined by Texas law. However, any such argument would likely lack merit.

"Under Texas law, a contract is divisible, or severable, when one party's performance consists of more than one distinct and separate item and the price paid by the other party is apportioned to each item." *In re Instant Brands Acquisition Holdings Inc.*, 170 F.4th 928, 934 (5th Cir. 2026) (quoting *Stewart Title Guar. Co. v. Old Republic Nat'l Title Ins. Co.*, 83 F.3d 735, 739 (5th Cir. 1996)). Although, the parties' arrangement here may look like a divisible contract on the surface, "[t]he intent of the parties is the principal determinant of divisibility." *Stewart Title Guar. Co.*, 83 F.3d at 739. To determine the parties' intent,

[36] ECF No. 312 §§ 9.1.1; 9.1.5.
[37] ECF No. 331 ¶¶ 17–18.
[38] ECF Nos. 312-2; 331-2.

courts consider the intent expressed in the plain language used in the contract. *Citation 2002 Invest. LLC v. Occidental Permian, Ltd.*, 662 S.W.3d 550, 555 (Tex. App. 2022).

The Factoring Agreement expressly contemplates the use of purchase addenda to effectuate the sale of receivables.[39] And each purchase addenda explicitly states that it is part of the Factoring Agreement and expressly incorporates its terms into each addendum.[40] Such provisions evince an intent that each purchase addendum is an indivisible part of the Factoring Agreement.

The terms of the Factoring Agreement further provide that StopLoss defaulting in the payment of any obligations or the performance of any provision of the Factoring Agreement or of any other agreement with IAG constitutes an "Event of Default" that allows IAG to terminate the Factoring Agreement and exercise its rights under Texas Law.[41] Such terms do not indicate that the parties' contractual arrangement "includes two or more promises which can be acted on separately such that the failure to perform one promise does not necessarily put the promisor in breach of the entire agreement." *Instant Brands,* 170 F.4th at 934 (quoting *Stewart Title Guar. Co.*, 83 F.3d at 739). In fact, the Factoring Agreement says the opposite.

The August 13, 2024, purchase addendum amended the Factoring Agreement to incorporate an arbitration provision to section 9.1.3.[42] Under Texas law, "[a] modification to a contract creates a new contract that includes the new, modified provisions and the unchanged old provisions." *Boudreaux Civic Ass'n v. Cox*, 882 S.W.2d 543, 547–48 (Tex. App.—Houston [1st Dist.] 1994, no writ). Under the Factoring Agreement, as amended, the arbitration provision plainly applies to disputes arising out of purchase addenda executed after August 13, 2024, as those addenda expressly incorporate the terms of the Factoring Agreement.

---

[39] ECF No. 312 §§ 2.2; 2.3; Ex. C.

[40] *See* ECF No. 331-2.

[41] ECF No. 312-1 §§ 8.1–8.2.

[42] ECF No. 312-2 § 13(b).

However, under the terms of the documents, it is unclear whether the parties intended the amendment to have a retroactive effect. The arbitrator did not think so and found that the Suburban Project claims were not arbitrable.[43] However, before he could fully consider a motion to reconsider, the arbitration proceedings were dismissed. There is no apparent indication that the amendment was intended to apply retroactively to already executed transactions. The Factoring Agreement merely states that "[t]his Agreement may be amended or modified only in writing executed by Seller and Buyer."[44] And the August 13, 2024 addenda states that "the [Factoring Agreement] is hereby amended" to include the arbitration provision.[45]

No evidence has been presented on this issue. Both sides could presumably make strong cases, and the Court could resolve what is sure to be a hotly contested factual dispute. The dispute related to the Lee Ho and Fortune Projects would be subject to arbitration as the addenda related to those projects do contain the arbitration provision, however, it is unclear whether the dispute related to the Suburban Project would. This is significant because the receivables purchased from the Suburban Project total over $7 million, while the receivables purchased from the other projects total about $2.5 million. However, for the reasons explained in Section III herein, the Court need not express a view on whether the arbitration amendment retroactively applies to the dispute related to the Suburban Project.

### B. Whether the Arbitration Provision is Illusory

The Debtors contend that even if the arbitration provision applies, IAG's claims are non-arbitrable because the arbitration provision is illusory.[46] They contend that because IAG exercises exclusive discretion to elect arbitration that IAG was not bound by any true promise.[47] The Debtors are wrong.

---

[43] ECF No. 362-5.
[44] ECF No. 312-1 § 9.2.
[45] ECF No. 312-2 § 13.
[46] ECF No. 331 ¶¶ 19–20.
[47] ECF No. 331 ¶ 19.

In support of their position, the Debtors cite *MasterWord Servs., Inc. v. Hennecart*, No. 14-22-00021-CV, 2023 WL 4883309, at *3 (Tex. App.—Houston [14th Dist.] Aug. 1, 2023). In that case, the Texas Court of Appeals held that a provision which provided for arbitration "at MasterWord's option" was illusory and unenforceable because the contract bound Hennecart to arbitrate while allowing MasterWord the choice. *Id.* at *3 (citation modified).

The Debtors' reliance on *MasterWord* is misplaced and ignores the context of that case. That case arose out of an employer-employee dispute. *Id.* at *1. The specifics of the employment relationship are unclear from the Fourteenth Court of Appeals' opinion, however in Texas, absent a specific agreement to the contrary, "employment may be terminated by the employer or the employee at will, for good cause, bad cause, or no cause at all." *Montgomery Cnty. Hosp. Dist. v. Brown*, 965 S.W.2d 501, 502 (Tex. 1991).

In the context of at-will employment relationships, courts have found arbitration provisions in employee handbooks to be illusory and unenforceable where the employer retains the unilateral right to amend the handbook and modify or terminate the purported agreement. *See, e.g.*, *Flex Enters. LP v. Cisneros*, 442 S.W.3d 725, 729 (Tex. App.—El Paso 2014, pet. denied). In such circumstances, the employer's obligation to arbitrate is optional, and when the performance of a promise is optional, the promise is illusory and cannot constitute valid consideration. *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 228 (Tex. 2003); *see also Tex. Custom Pools, Inc. v. Clayton*, 293 S.W.3d 299, 309 (Tex. App.—El Paso 2009, no pet.). The employer's continued employment of the employee cannot serve as consideration in an at-will employment relationship. *Id.*

This is not an employment case. This is a claim objection in a Chapter 11 case that arises from the sale of receivables. The Texas Supreme Court has recognized that "when an arbitration clause is part of an underlying contract, the rest of the parties' agreement provides the consideration." *In re Advance PCS Health L.P.*, 172 S.W.3d 603, 607 (Tex. 2005). Under the Factoring Agreement and the various purchase

addenda, IAG agreed to purchase certain of StopLoss's accounts receivable for millions of dollars. There is no colorable argument that IAG undertaking those purchase obligations did not constitute sufficient consideration. The arbitration provision was supported by consideration and is not illusory.

### II. WAIVER[48]

Alternatively, the Debtors argue that even if the arbitration provision is applicable, IAG has waived any right to arbitrate. In the Debtors' view, IAG commencing arbitration proceedings that were eventually dismissed and IAG substantively participating in these chapter 11 proceedings, by filing a proof of claim, was inconsistent with IAG's right to arbitrate and resulted in waiver.[49]

To determine whether a party has waived the right to arbitrate, the Court asks, whether the party "knowingly relinquish[ed] the right to arbitrate by acting inconsistently with that right[.]" *Morgan v. Sundance*, *Inc.*, 596 U.S. 411, 419 (2022). In the Fifth Circuit, a party substantially invoking the judicial process is one way of demonstrating that it waived its right to arbitrate. *Garcia v. Fuentes Rest. Mgmt. Servs. Inc.*, 141 F.4th 671, 676 (5th Cir. 2025); *see In re Mirant Corp.*, 613 F.3d 584, 589 (5th Cir. 2010) ("To invoke the judicial process, a 'party must, at the very least, engage in some overt act in court that evinces a desire to resolve the arbitrable dispute through litigation rather than arbitration.'"). However, "bright-line" rules are inappropriate for deciding whether a party has waived its right to arbitrate. *Id.* The waiver inquiry is inherently fact specific. *Id.*

---

[48] The Court has written about waiver extensively in a related adversary proceeding in this case. *StopLoss Specialists, LLC v. Insured Advoc. Grp. LLC (In re TM36, LLC)* No. 26-90386, Adv. No. 26-3072, 2026 WL 2235086 (Bankr. S.D. Tex. Aug. 3, 2026). IAG's brief, like its brief in the adversary proceeding references pre-*Morgan* authorities which have been largely overruled.

[49] ECF No. 331 ¶¶ 21–25. The Debtors also reference conduct in the related adversary proceeding. IAG's conduct in the adversary proceeding is irrelevant to waiver in this matter and will not be considered.

IAG has not waived its right to arbitrate its claims related to the Projects by its pre-petition or post-petition conduct. First, the dismissal of the arbitration proceedings does not necessarily demonstrate that IAG acted inconsistently with its right to arbitrate the Project claims. The parties dispute the cause of the dismissal, with IAG contending that the arbitration proceedings were dismissed due to Specialist's not paying their half of the required fees, and the Debtors contending that it was dismissed for want of prosecution. Debtors argue that if IAG really wanted to arbitrate, it would have paid Specialist's half of the fees and continued arbitrating. On the current record, the Court is unpersuaded that these facts support Debtors' contention that IAG necessarily "abandoned" the previous arbitration.

Second, IAG's participation in these Chapter 11 proceedings is not inconsistent with its right to arbitrate. IAG filing objections to the Debtors' motion to obtain post-petition financing and appearing at hearings and arguing on the merits against the requested relief is similarly not inconsistent with IAG's right to arbitrate. IAG is a creditor in this case, and the Code explicitly provides that creditors are parties in interest that "may raise and may appear and be heard on any issue in a case under this chapter." 11 U.S.C. § 1109(b); *see also Truck Ins. Exch. v. Kaiser Gypsum Co.*, 602 U.S. 268 (2024).

Third, IAG filing a proof of claim did not result in it waiving its right to compel arbitration. The Debtors provide no case that supports their proposition that filing a proof of claim against the estate results in waiver. Nor could they. Such a determination would run afoul of Fifth Circuit precedent which has held that there are no bright-line rules to determine when a party has waived its right to arbitration. *Garcia*, 141 F.4th at 676.

### III. DISCRETION NOT TO COMPEL ARBITRATION

Lastly, the Debtors argue that even if the arbitration provision is applicable, the Court should exercise its discretion and not enforce

arbitration.[50] The Court agrees and will exercise its discretion to not compel arbitration of this matter.

In the Fifth Circuit, a bankruptcy court may decline to enforce an arbitration provision where (1) the underlying nature of the proceeding derives exclusively from the provisions of the Bankruptcy Code[51]—not the debtor's prepetition legal or equitable rights, and (2) the enforcement of the arbitration provision would conflict with the purposes/goals of the Bankruptcy Code. *In re Henry*, 944 F.3d 587, 590–91 (5th Cir. 2019) (citing *In re Nat'l Gypsum Co.*, 118 F.3d 1056 (5th Cir. 1997)).

Here, this contested matter derives exclusively from the provisions of the Bankruptcy Code. Under § 502(b), when an objection to a proof of claim is made, "the court, after notice and a hearing, shall determine the amount of such claim." 11 U.S.C. § 502(b). Filing an objection to a proof of claim initiates the procedure for determination and allowance of a claim which derives exclusively from the Code. The Fifth Circuit has stated that:

> [A] claim filed against the estate is a core proceeding because it *could arise only in the context of bankruptcy*. Of course, the state-law right underlying the claim could be enforced in a state court proceeding absent the bankruptcy, but the nature of the state proceeding would be different from the nature of the proceeding following the filing of a proof of claim.

*In re Wood*, 825 F.2d 90, 97 (5th Cir.1987).

This logic applies to an objection to a proof of claim with the same force because a claim objection could only arise in the context of bankruptcy. Indeed, as Judge Lynn recognized in *In re Mirant Corp.*:

---

[50] ECF No. 331 ¶¶ 26–40.

[51] Notably, though, whether a matter is a "core" or "non-core" proceeding under 28 U.S.C. § 157 is not, by itself, dispositive of its arbitrability. *See In re Nat'l Gypsum Co.*, 118 F.3d at 1067.

> The procedure for liquidation of claims against a bankruptcy estate and their allowance and disallowance is at the very heart of the bankruptcy court's function and purpose. This court does not therefore read *Nat'l Gypsum* as empowering parties to use an arbitration clause to divest the bankruptcy court of its generally pervasive authority to control quantification of claims merely because the substance of a claim objection is rooted in state law.

316 B.R. 234, 239–40 (Bankr. N.D. Tex. 2004).

Next, the enforcement of the arbitration provision in this case would conflict with the purposes and goals of the Bankruptcy Code. The Supreme Court has recognized that:

> [A] chief purpose of the bankruptcy laws is to secure a prompt and effectual administration and settlement of the estate of all bankrupts within a limited period, and that provision for summary disposition, without regard to usual modes of trial attended by some necessary delay, is one of the means chosen by Congress to effectuate that purpose.

*Katchen v. Landy*, 382 U.S. 323, 328–29 (1966) (citation modified). Additionally, the Fifth Circuit has identified two other purposes of the Bankruptcy Code relevant here: (1) resolution of bankruptcy issues in a centralized forum; and (2) protection of reorganizing debtors and creditors from piecemeal litigation. *Nat'l Gypsum*, 118 F.3d at 1069.

IAG's claim, while not assigned a value, seems to seek close to $10 million, and if allowed, would be one of the largest unsecured claims against the estate. Compelling arbitration of IAG's claim would contravene the Code's purpose of providing a central forum for resolution of claims against the Debtors. *Id.*; *see also In re White Mountain Mining Co.,* 403 F.3d 164, 169–170 (4th Cir. 2005) ("Arbitration is inconsistent with centralized decision-making because permitting an arbitrator to decide a core issue would make debtor-creditor rights contingent upon an arbitrator's ruling rather than the

ruling of the bankruptcy judge assigned to hear the debtor's case.") (citation modified). Further, compelling arbitration here would shut out the Unsecured Creditors' Committee from a proceeding that could significantly affect the size of the unsecured claims pool.

Arbitration would also conflict with the prompt administration of the claim objection. "An important advantage of centralized determination of claims is the bankruptcy court's ability to coordinate the timing of that process with other aspects of a debtor's reorganization and ensure expeditious distribution to creditors." *Mirant*, 316 B.R. at 242. Submitting this dispute to arbitration divests this Court of the ability to ensure that this claim objection is expeditiously resolved and that this case proceeds towards a conclusion. The Court is already familiar with the Factoring Agreement and the dispute between the parties. Requiring an arbitration proceeding to start over could impose substantial delay and impose significant costs on the estate and its creditors.

IAG's suggestion that the Court send the determination of the liability and damages to an arbitrator and retain authority over allowance and disallowance[52] is not practical. The summary proceedings that the Bankruptcy Code provides for were intended to avoid such delays. And bifurcating these issues and divesting the Court from the ability to control a key part of the estate's administration is wholly inconsistent with the purposes of the Bankruptcy Code.

Lastly, there is a notable risk of piecemeal litigation and parallel proceedings here. As noted in Section I, it is unclear whether the parties intended for the arbitration provision to retroactively apply to previously-executed purchase addenda. Determining that issue may involve substantial time and resources. If the arbitrator were to again conclude that the Suburban Project dispute was not subject to arbitration but the disputes regarding the Lee Ho and Fortune Projects are, it could result in inconsistent decisions from the Court and an

[52] ECF No. 362 at 11–13.

Arbitrator on issues which rely on the same Factoring Agreement and the same factual circumstances. Also, the Factoring Agreement is already before the Court in Adversary Proceeding No. 26-3072. Arbitration of this claim objection could similarly result in inconsistent decisions on interpretations of the same documents. Such a result is both undesirable and inconsistent with the purposes of the Code.

**CONCLUSION**

For the reasons explained above, IAG's motion to compel arbitration is DENIED. Debtors shall settle an order within 7 days of this Memorandum Opinion.

SIGNED 10/07/2026

Alfredo R Pérez
United States Bankruptcy Judge